Our second case is 23-4360, United States v. Sandoval, Mr. Hunter. Good morning, may it please the court, Judge Diaz, Judge Nehmeyer, Judge Maddox, my name is Greg Hunter. I'm here from the Eastern District of Virginia representing Kevin Perez Sandoval. I'm joined today by my friend Tom Walsh, who's here for Carlos Cruz Moreno, and Adam Krischer, who's here for Jose Rosales Juarez. This appeal really has more to do with us as officers of the court than it does the defendants and the case at bar. We have duties to clients within our cases, but they're transitory. Our duties to the court, our roles as advocates, those persist. And when we try individual cases, when we represent individual clients, there's a systemic duty that we have. We're truly servants of law. The process itself matters, and the process itself failed. On the interpreter question, this is a case where the people involved are Spanish speakers. The witnesses, the victims, the defendants are Spanish speakers. The events that happened, when they happened, were essentially in Spanish. The internal monologues people had, the words that were spoken outright, the e-mails, the text messages, all of that is in Spanish. But the people deciding their fate, the investigators on the case, the lawyers on the case, the trial court judge, the jurors, all of them are English speakers. All of them. All of the official communication, everything on the record is in English. And so we all depend on these court interpreters. We depend on them to understand what's being said. We depend on them to understand what's being asked. And we depend on them to communicate what we're trying to say and what we're trying to ask. And we know that that was a standard that was failed here. We don't know how badly it was failed because there's no record of what's said in Spanish. There's no record of when a certain interpreter is on or is taking a break. We only have the English. But in that English transcript, we have two terms. Your Honor, can I ask you about that? Do you think that that's required, that we needed to have the Spanish words on paper in order to decide this case? I don't, Your Honor. I only noted to show how silent the record is here on this important thing. Was there a recording of that? There's not. I mean, a system like this, there's no recording in the courtroom? There's not. How is the transcript made? The transcript is made by a court reporter making a verbatim court transcript, as court reporters do. I was a trial judge and a trial lawyer, and every time they had a backup tape going. And oftentimes the court reporter used the tape just to fill in gaps. That wasn't done? To the extent that that would have been possible, Your Honor, that's between the judge and the court reporter. The judge did make a good faith effort to find out what was said, but we don't know. Yeah. We truly don't know. Do you contend that there was any deficiency in what the district court did to investigate the issue? Well, what I contend is I don't see that the judge had ‑‑ I don't think that Judge Trenga, a man that I have tremendous respect for, a truly, truly thoughtful judge, he did his best here. The problem that we have is that the only Spanish speakers in the room, the two jurors who thought enough of this to write notes to the court, the court interpreter who told the judge, I'm trained not to do this, I'm trained to not tell you, but this is so bad, the worst I've seen in my career, those are his words. Slightly shy of catastrophic, those are his words. I have to tell you. There were other interpreters who weighed in on this, correct? There are, but you think about what their roles are and what they said. Even that interpreter, though, when he went into detail, the judge did quite an exploration. I thought he went about his ‑‑ did as much as he could have, and the interpreter who explained it basically mitigated those statements a lot when it came to actual examples. It occurred on a particular day, and that interpreter, Prado or whatever his name was, he was then dismissed, and so we have that one day, and we have two jurors being canvassed on where they thought the problems were, and we have the other reporter being canvassed, and so the question is the judge sees what was understood correctly and what was not, or apparently was messed up. The judge also allowed recross examination if there was an issue there. He did. So I think it comes down to there was a glitch, there's no question about it. You've accurately described it, but the question is there was a judgment call made by the judge in the circumstances. What do we have, a three‑week trial? More than that. And your argument, of course, is you wanted to start over, and the judge tried to retrieve the trial, and so the question is whether that's an abuse of discretion, I gather. And that's really the question here, Judge. We don't know what else was translated by Mr. Prado. Well, we do, because people who did speak Spanish, and we had three of them testifying, discussed what they thought the problems were, and there were quite a few samples. They also discussed what else they were paying attention to at the time. As someone, I mean, I'm bilingual, I've been a court interpreter. It's incredibly difficult. Spanish is the only language that we have a certification program for, and this is a failure within their certification program. And, in fact, within the certification program, they trained the other interpreters not to notify the court when they're hearing something catastrophic. Well, I thought the second interpreter in this case jumped in from time to time to assist Prado in doing the testimony. Well, there were whole times when he didn't, and part of the problem, Judge, is we just don't have the record of that. But they weren't identified by the jurors or by that interpreter. True, but we have a trial court judge who's trying to do a million things all at once. Being a trial court judge is truly drinking from a fire hose. Very, very difficult to pay attention to which interpreter is on and which interpreter is not. We have, from the English record, a Spanish-speaking witness correcting the interpreter about the question being asked to him from English to Spanish and the answers that he's giving from Spanish to English. This is a man, the least bilingual of all the people in the room, is noticing these problems. We don't know, and that's the problem. Judge Trenga then has no choice but to order the jury, in his jury instructions, to ignore what they heard, if they're Spanish speakers, and only pay attention to the English translation that we know was problematic. The government makes a lot of noise here about the English translation, what's in the court record matching these prior interviews, which are not in evidence here. But it's impossible to know. We don't know what Mr. Bonilla said, and that makes it impossible for us to effectively cross-examine this witness. It makes it impossible for our clients to assist us in our representation of them. It violates their right to confrontation. But we also have this violation of due process because we have a jury deciding evidence here based on testimony that's clearly a flawed translation to them, and a trial court judge making rulings based on information that we know is missing. Mr. Hunter, can I ask you this? So do you disagree that Judge Trenga did what he could to remedy the translation issue that was disclosed to him? You're making arguments about what else might have happened, but with respect to the particular translation failure that occurred that he was made aware of, do you disagree that he did what he could to remedy that? He did what he could, Judge, but where I find this to be insufficient, you have this court reporter who is an expert in this, the English and Spanish speaker, who's there for it, he's also a fact witness in this, and he tells Judge Trenga that this is the worst he's ever seen in his career. And on the worst this man has ever seen... Yeah, but then he was... that's fair enough. He did say that. But then the judge, of course, he alerts to that, and he starts asking him where were the failures and where were the problems. And the court identified as much as it could. As much as it could, Judge. Yeah, and so when you say we really don't know, well, we do know where the failures were. We know a few instances. One you would agree is probably not a problem where he said three instead of 13 for MS-13. MS-3 came across or something, and the juror explained that was easy to understand. The content was understand. The most serious was speaking about one witness, one person near a fence, when it was really the other person. And that was explained, and everybody in the courtroom knew, and that could be reconstructed under cost. My point is the court... the man did say it was bad. But then the judge pursued that and said, okay, I want to know those instances. And asked him in the... I mean, you have a legitimate gripe. I'm not suggesting that... I appreciate that, Judge. The judgment call we have to make is whether the district court made the right judgment call in the consequences of this on the trial. I think my point here, Your Honor, would be he did the best with what he had, but what he had was woefully... Well, that's a fair argument, but the question is the judge did explore it. If the judge didn't know how long this was going or didn't know what the problem was and just went on... Even what he's able to... But here we have a judge who stopped everything and isolated witnesses and then talked to at least three about the problems who spoke Spanish. But doing the best that he can there, Your Honor, we don't know what the actual questions were that were asked of this witness. We don't know. We don't know what was said in Spanish. We don't know what his actual answers are. We know that they're trying, and hours later, days later, trying to reconstruct that, I think leaves us not just with a legitimate gripe, Your Honor, but truly our clients have been robbed of their right to properly confront and cross-examine this witness, to properly assist us in our defense of them. And the public is robbed of that as well. The jury is told in their jury instructions to ignore what you know to be true from what you heard if you're a Spanish speaker and only go with this translation that we know is flawed. Is there any specific indication in the record that not all of the issues with the translation were put on the table during the district court's inquiry? The problem, if you read that, and I truly hope that you do, is that they're going on the best memory that they can come up with from a time when they were speaking in English and in Spanish at the same time, the interpreters, or as the jurors, where they're trying to pay attention as they were instructed to the English that's coming out of the mouths of the interpreters. And that just makes it really hard from a silent record. But it was pretty close in time to when the issues occurred, correct? It is, but it's still incomplete. How do we know it's incomplete? Because they say it. They say it in their answers, Judge. They say, well, it's really hard to remember. They say, I know it was problematic at the time, and I just can't put my finger on it. Because it's going in two languages at once while they're trying to pay attention to other things. I've got limited time left. They put up a witness, an expert witness. That man's a corrupt, now fired, defrocked, cannot work anymore as a police officer. The FBI was involved in that investigation before this trial started. There were meetings during this trial, after this trial, assistant U.S. attorneys from their office who knew in March of that year while this was going on. This trial team had these materials in hand months before telling us. They had all of the materials despite Judge Trenga's 11 express warnings under the Due Process Protections Act and his express warning when this problem started when the sentencing hearing was continued, to turn this stuff over. And we know that there's materials. The latest they had them was October 20th, and they don't give them to us until November 25th. And what they gave us was redacted. We've had no opportunity to investigate that, no ability to talk to anybody to ask our own questions of what this was. We know this is an important witness because they called him first. We know that it's important. Well, you know, he is an important witness, but he spoke nothing of historically or factually about the circumstances of the case. He spoke about the structure of MS-13. Consistent with what the cooperators, the violent felons were going to say. That information apparently is accurate based on probably hundreds of cases that have reported it. I've personally written about MS-13, but so have others. We heard one last term, and we heard extensively about the structure. And these opinions all point out the very same type of structure of the cliques. They could have called someone else, Judge. The operations, the way it functions. And the only person that didn't know about it is the jury, and they had to be told about it. This guy was conveying it. But I don't think anybody has suggested that he spoke improperly about the structure of MS-13. He was sort of a background witness to explain the structure, how it functions, again. He's also there to give credibility to the violent felons and cooperators who were there to testify about it. That's why his testimony is important. My whole point is that there's nothing to lie about, because it's not a lying type of thing. He's not talking about something that happened historically or not. He didn't give testimony of who was where and who was here. He was giving testimony about the structure of MS-13. Well, Your Honor, we objected to the staleness of his knowledge. We objected. We've wardered that extensively to try and chop away at that credibility. They chose this man despite the fact that people in the FBI who work with these agents, people in their office, knew that he was without, in the words of the people that fired him, without integrity. What area do you think would have helped you had you known he, I guess your argument is that he testified falsely to the FBI, and you would want to impeach him on his credibility, right? Had they told us after that other meeting in March and were able to call him as a rebuttal witness? I mean, if you had a full scope of his foibles, he lied to the FBI, right? Right. Is that the argument? And so now what aspect of his testimony would that have helped you on? I think it calls into question the honesty, the veracity, the credibility of everything on the government's side of the ledger. No, no, no. I'm talking about this man's testimony about MS-13. What cross-examination question would you have asked him? He testified consistently with just about the public, it's almost public knowledge about MS-13, and the question is what question do you think he answered falsely that you would have been able to impeach him on? It's a good question, Your Honor. I think my response to that would be they chose this witness. The people investigating him in the very earliest communications that they have expressed their concern that this is the guy that the FBI and the Department of Justice put up in trial after trial after trial, and he is corrupt and dishonest, and in their words, completely without integrity. When do you contend that his dishonesty became known? To us? No, at any time. When did the FBI learn that he was testifying falsely? January, weeks before the case started. We know that, and we don't find out about it. No, I understand. We're talking about a gig deal problem. Yes, Judge. Okay. Thank you. Thank you, Mr. Hunter. Ms. Bichara? Bichara. Bichara, thank you. Good morning, and may it please the Court. Jacqueline Bichara for the United States. I'll start with the interpreter issue, and I just want to address first this question about the lack of a record of the specific questions that were posed to Bonilla in Spanish as well as his original testimony in Spanish versus the translation. There is actually a provision that allows for that. That's the Court Interpreters Act, 28 U.S.C. 1827, and there's a specific mechanism. If either party believes that there is some kind of issue with the accuracy or scope of the interpretations, they can request that a recording be made contemporaneously, which then could be made part of the record for purposes of the appeal. I'll just note for the Court, in United States versus Lieva, that's from the Seventh Circuit, 2016, 821 F. 3rd. 808. That's an instance where this issue did arise in the trial court, and so the defendant asked, there was a break in the trial proceedings, and the defendant requested that the district court make this kind of recording, and then that was available to the Seventh Circuit when they were reviewing in order to respond to this kind of allegation that, well, we just don't know what happened at the trial court. Here, the defendants never requested that any kind of recording be made, even though, as I said, this is a known and available provision. So I would just push back on that suggestion that, basically, the Court could never really know. Again, the court reporter didn't use a backup tape recording. A tape recording? No. There was a backup interpreter, a live interpreter, and they were switching off approximately every 15 minutes. As you asked in my friend's opening, that female interpreter, Ms. Interpreter Del Pazzo, was specifically asked because her obligation as a federally certified corporate interpreter was to listen both to the questions that were being posed in English and then their interpreter as opposed to the witness in Spanish and then the witness's statement in Spanish and then the interpretation of his answer from Spanish to English. She's listening to all of that contemporaneously, and her obligation as a court interpreter is to notify the court. I think she said that she would tap her colleague if she believed that there was some kind of issue that warranted correction, and she said, actually, there were a couple of instances that did occur during this witness's testimony. When that happened, I did correct, or I kind of signaled to my friend that there was a need to correct. I think probably the easiest way for the court to resolve this case is to hold that there were no constitutional violations with respect to these isolated interpretation issues, either with respect to the defendant's due process rights or confrontation clause rights. I haven't heard my friend address the question of structural versus harmless error. I'm happy to get into that if the court is interested, but like I said, I think there was no violation here, and so probably the court doesn't need to reach that question unless you would like to. Just to start from the top, the district court found after a thorough examination of five Spanish speakers, there were the two Spanish-speaking jurors and then the three other interpreters who were in the room. The district court conducted a pretty extensive inquiry of each of these people to identify exactly what issues that they heard. As Judge Maddox observed, this was as close in time as possible as it could be to when these events occurred, so that's really the best record that the court could hope for on this issue. The district court ultimately concluded that there was simply no widespread error in the interpretations of the trial, so that claim is really not supported on this record. Then all we have are a handful of interpretation issues by one interpreter with respect to one witness on one day of a multiple-week trial. Then if you look at the actual substance of the issues that were identified, and my friend didn't really get into the specifics of those issues and kind of why they might be material. We submit that they're not. As we argued in our brief, really the only two that the defendants continue to focus on in their opening brief are the question about the backpack and then the testimony about who was by the fence. A couple of things about the backpack. Bonilla said very clearly, yes, it was my backpack. His testimony was clear that it was in the back seat. That was the meaning that needed to be conveyed to the jury, and ultimately it really isn't material for purposes of this case because Cruz Moreno was acquitted of the 924C, which was the only relevance of the backpack, which is where the gun was found after the April 20, 2019 traffic stop. Then there's the question about who was by the fence, but again, Bonilla repeatedly said, and there were moments where he actually corrected the interpreter, no, I was never by the fence with Castro or Guer. There was some confusion because everyone had multiple names throughout the course of this trial, and so understandably some of the defense attorneys, and I think it crept into one of the interpreter's references to who was by the fence. That was flowing from the fact that there was some confusion about whose nickname corresponded to which person, as well as the fact there was a Kevin Castro and then Kevin Perez-Sandoval, the defendant in this case. But in all events, the testimony was clear that it was Kevin Castro who was at the fence, who shot Norman Medina-Sanchez. Can I ask you a question about the interpreter who, sui sponte, offered his opinion about the competence of the interpretation in this case, and ask you what Judge Trenga did, if anything, with the response, that is that the interpretation, as he put it, had been slightly shy of catastrophic, and that he had never seen such bad interpretation in his professional life. That seems to be pretty concerning. So, I mean, how do you reconcile that with the notion that there's nothing to see here? It is a concerning comment, and so I think that Judge Trenga, who, of course, is a very experienced judge in our district, asked this interpreter for specifics. Okay, well, what do you exactly mean by this was slightly shy of catastrophic? Are you talking about, well, first he said it was sort of difficult to hear the questions and the answers, and then Judge Trenga pressed him, and he said, okay, are you talking about, are we getting at meaning or something else? And the interpreter said, yes, I am talking about the meaning. Okay, so that's something that we should be concerned about. But, again, the next day this kind of inquiry or hearing resumed about what are we actually talking about? What did you mean? And the only specific example that that interpreter, Mr. Lopez, could identify was this, when Bonilla kind of unprompted made this comment about the machete that was found in the adjoining bedroom. And so Interpreter Lopez said this was clearly not a correct translation. What the witness actually said was that a machete could be used to split open a coconut. But what was interpreted to the jury was that a machete could be used to split open boxes. Now, I think we can appreciate that's not a verbatim translation, but it does accurately convey the meaning in context on the facts of this case, which is just that Bonilla was trying to deflect and suggest that you could have a machete for some kind of innocuous purpose. That was the only specific example that this interpreter could identify, and I think that's notable because, as we were talking earlier, the certified court interpreters do have an obligation to be listening to the testimony, to the questions and the answers as they're being interpreted to and from the witness. So if that was the only example that he could really identify, that suggests that that was really the only issue that was material to that interpreter. And I would add, as Judge Niemeyer noted, Judge Trenga correctly brought in the other interpreters, first the interpreter who was serving as the backup during Bonilla's testimony, as I said, del Paso, who said, no, Your Honor, there were no material mistranslations, and as it is my obligation as an interpreter, if I had heard something that I thought was so egregiously incorrect, I would have notified Your Honor. She said that repeatedly. Similarly, Interpreter Ayala, who was there for multiple days when this kind of interpreter at issue, Mr. Prado, was interpreting, again, Interpreter Ayala said, no, I didn't hear any material mistranslations, either with respect to this specific witness, Bonilla, or during the other interpretations. Does the district court in Alexandria not have the practice of making audio recordings of court proceedings? Not that I know of. Okay. I don't believe that one was made in this case. It was my experience that usually the court reporters chose whether or not to do it. I can remember in the old days, I don't know if they still do it. They did everything manually, but there were some that did it by voice, and then many of them brought in tape recorders as backup for their own benefit, and I'm not sure that is mandated. I think it's usually up to the court reporters. I've been away from it for a while, so I don't know what the practices are today, but it would seem with technology it would be pretty good just to have a recording. I take your point, Your Honor, and perhaps that's something that we will convey. You're being recorded now as we speak, and your words will be preserved. I'm very aware that I'm being recorded. I can talk briefly about the confrontation issue as well. Just to point out a couple of things, the district court confirmed on the record that defense counsel had received six prior reports of interviews with Bonilla, and the district court specifically asked defense counsel, was there anything that you heard in Bonilla's testimony as interpreter that surprised you? And defense counsel didn't identify anything. They did extensively cross-examine Bonilla throughout his examination, and specifically the district court, after ruling that it would not declare a mistrial, it said, however, that it would permit the defendants who had completed their cross-examination, and there was one defendant who was still in the middle of his cross when this issue arose. Judge Tringo said, okay, I will allow you to re-examine Bonilla on these issues that have been identified. None of the defendants took the district court up on that opportunity, so certainly that was an appropriate remedy for the identified error, and the fact that they forewent it suggests that these issues really were not material. Unless the court has other questions about the translation issue, I can talk briefly about the Brady-Giglio issue. I just want to make it very clear for the record that the prosecution team was not aware of the report from the Herndon Police Department to the FBI, the FBI's initial assessment, the closing of the FBI's assessment, the Herndon Police Department's internal investigation, their findings, any of that until after this trial had concluded. I know that Judge Tringo assumed for the purpose of resolving the new trial motion that the evidence had been suppressed because I think he believed that was the cleanest way to dispose of the motions without requiring or getting into this question about post-trial subpoenas and having further fact-finding on those questions, although I think that he still developed a pretty thorough record here. So is it your view that he could have just said they didn't have it and that's the end of it? There's no suppression because they didn't have it? Okay. Not in any case. On the facts of this case, yes, Your Honor, and that's consistent with this court's precedent in several cases because of where this obligation flows from. In Ciles v. Whitley, the Supreme Court explained basically this duty is based on agency principles, right? And, of course, the government has an obligation to learn of exculpatory or impeachment evidence from others who are acting on behalf of the prosecution team. And so that's why there is some limiting principle to this duty to find information. In cases like Robinson and Taylor and Horner v. Nines and in Banks, this court has recognized, okay, this is not a boundless principle where you have to conduct wide-ranging misconduct inquiries of any possible law enforcement agency. Here, it's very significant that Detective Saw was not involved in this investigation. He specifically acknowledged that in his testimony. He didn't investigate these particular defendants. He had no specific information about their clique. The Herndon Police Department also was not involved in this investigation whatsoever. To the extent that they referred it to the FBI, their report was to the FBI's public corruption squad. However, the public corruption squad, again, had nothing to do with this gang case. The Washington Field Office's gang squad, we had two FBI agents who testified at trial, but they're not part of the public corruption squad. And so this court has recognized in other cases, even when there are two divisions of the same sheriff's department or police department, that knowledge is not necessarily attributed to the prosecution team when one division was never involved or marginally involved into the actual investigation of the defendants. And that's why I would submit that, yes, in this case, the court could have ruled that the prosecution team did not suppress this evidence because the knowledge should not be imputed to the AUSAs in this case. But, of course, I recognize that if the court is looking for the most straightforward path to affirm, you can just say that the evidence, both under Brady and under Rule 33, was not material. Obviously, Detective Saw was not, Judge Trenga specifically found he was not our star witness. He also was by no means our sole witness. There were over 30 witnesses who testified at trial. His role was only, as Judge Neumeier observed, to provide context about the history and practices and kind of key words of MS-13, essentially to establish that MS-13 is a racketeering enterprise. But you will note that the defendants have never actually contested that MS-13 is a racketeering enterprise. And, of course, there were four former MS-13 members who testified consistently with Sergeant Saw about MS-13's practices, their rank structure, their code words. And I acknowledge in the opening argument, there was the suggestion that essentially Sergeant Saw's testimony had some additional weight or something because he was a law enforcement witness as opposed to a gang member. Respectfully, before Sergeant Saw began his actual substantive examination, Judge Trenga gave the jury a very specific limiting instruction, telling them that basically his testimony should be given no more weight than that of any other witness. Just because he's an expert, that doesn't make a difference, right? They should give it whatever weight the jury deems appropriate. And, of course, the cooperator's testimony was corroborated by voluminous physical and photographic text message WhatsApp message evidence. So it wasn't like the jury just had to go off of the word of a couple of gang members. Can I ask you about the scope of any examination? Had the defense actually known about this situation? Mr. Hunter and his colleagues seem to suggest that they could have vigorously examined Detective or Sergeant Saw. That's obviously true. They would have, I suppose. But then that they would have engaged in sort of a far-flung exercise into investigating the FBI and others in the chain of command. How far down do you think they could have gone with this evidence had it been actually before them? Well, this is classic impeachment evidence. And that's why this court has repeatedly said that's not what warrants a new trial. I think the defendants pretty extensively examined, impeached, Saw on the fact that he hadn't even directly participated in a gang investigation in almost 10 years. He didn't have any kind of, like, academic study. He hadn't read any recent literature on this. His frame of reference was pretty dated at that point. So I think perhaps, well, then again, we're doing this counterfactual. All that existed at the time of trial was that the Herndon Police Department had reported to the FBI a potential FARA violation. At that point, I heard my friend suggest that Sergeant Saw had lied to the FBI. That's not correct. That's not what he was decertified for. He was decertified for violations of Herndon Police Department's code of conduct. But that's separate. Well, I had trouble figuring out precisely what the Giglio issue was. He had gifted these holsters, expensive holsters, to the El Salvador police person. Right. And is that the issue, or did he testify falsely and cover that up, or what? No. The issue was, well, I understood there to be kind of two issues. Before the event at the Salvadoran embassy, he had traveled to El Salvador in September, yes, September of 2021. Sergeant Saw traveled to El Salvador on what he represented was a personal travel. But while he was there, he was at an FBI facility, and he made a representation that he was actually there in his capacity as a Herndon Police Department officer. Maybe that's what my friend is getting at. I submit that's not false testimony. It's maybe a misleading statement. We don't really need to get into that. But there was that, and then there was the event at the Salvadoran embassy where he gifted the holsters, and he was wearing his uniform, his police uniform, without prior approval. And so those were what were the... So there's no evidence that you're aware of that he was later interrogated and lied to the FBI? I don't have evidence of that. I do know that they interviewed him as part of the FARA assessment in May of 2022. So that's two months after this trial concluded. The FBI interviewed him, and then they closed their assessment of the FARA violation. And, of course, the U.S. Attorney's Office never pursued that kind of... So what do you understand to be the Giglio information? How would he be impeached? Based on violations of his police department's code of conduct. But, of course, those violations were not... There were no findings of violations, no memos, nothing like that. And, of course, he was not reported to the... Oh, I'm sorry, I see I'm way over my time. You can answer the question. Okay. All of that did not happen until months after the jury had returned its verdicts in this case. Do you have anything else? I did have a quick question. I'm not sure how quick it is, actually. I know the imputed knowledge issue may be a more difficult issue here. In your view, is the case law clear enough as to where to draw the line with respect to imputing knowledge to a prosecution team? And, yeah, I'll just ask it that way. I think it's clear enough on the facts of this case, where the officer in question did not work on the investigation into these defendants. He offered no evidence specific to this case. It was all just general knowledge. And so that's why it is appropriate to draw the line somewhere beyond Sergeant Saw, the Herndon Police Department, FBI's Public Corruption Squad, all of which had nothing to do with this investigation of these two attempted murderers. Thank you. Thank you, counsel. Thank you. All right. I think this, again, starting with the interpreters issue, just because we were here, counsel for the government mentions the Court Interpreters Act. Everything in the Court Interpreters Act still comes down to our dependence on interpreters working very, very hard to tell us what's happening, what happened. We have backup interpreters, yes, but they're doing other things. Of the four interpreters in the room, two of them are on break. If they hear something, yeah, they should tell, but they're also, please, take that break. Take that mental time so that you can be as sharp as you need to be the machines we depend on them to be, providing simultaneous translation. The interpreter who came and registered his complaint is, at the time, performing another interpretation job in the courtroom. He's listening to this and interpreting Spanish back into English, English back into Spanish. Trying to note details while that's going on is well and I impossible. We know that there's a standard here. We know that it was failed in such a way that this court interpreter, not a regular, does not know the other court interpreters. He's been brought in from another district to help with this trial. Says it's the worst he's ever seen and we just don't know how bad it was. We just don't know what questions were asked. We don't know what the answers were that were given. The government makes the point that, you know, we could have recrossed. We could have done more. How do we identify those errors? We don't know. All we know is it was bad. Makes it impossible for us. On the Claudio Sa issue, no one told their team until after trial, fine. Let's take that. But when did they know? They knew in March. What is the information that I had trouble in reading this and figuring out what the Giglio issue was? In other words, what is the impeachment evidence? I do know he presented himself at the FBI facility and he also appeared in uniform at the police department. Both of those apparently were misstatements or puffing himself. I don't know what he's doing. It's worse than that, Judge. It's significantly worse than that. He appears at this FBI office with an El Salvadoran official that the FBI believes to be corrupt and connected himself to MS-13. He appears at this FBI office. He says at various times that he's there on official business, that he's there on vacation. This was so alarming to his superiors within the Herndon Police Department. They're like, how do we believe him about anything? About anything. We know that he's a liar. We know that. And we know that the government knew in March. Their office, their team. We know that the very next MS-13 trial to start, which was right after ours, doesn't use Claudio Soft. First time he hadn't been used in years. So we know that. But we don't know everything about it because they've kept us away from being able to find out. We don't know who the U.S. attorneys are. We don't know who the FBI agents are. We've only been given their internal investigation. We don't know. We can't even ask the questions. They created the counterfactual. We know that they've kept this from us, and we just don't know why. This team also certainly knew in August what they were talking about, and they don't tell us. We know that every bit of material they had, no later than the 20th of October, express instructions from Judge Tringa to provide it to us immediately. And we know that they go into a status conference and say, we don't have everything yet. When we get it, we'll promptly give it to defense counsel. And they don't give it to us until November the 25th. It creates an incentive not to tell. No one in the office knows who's prosecuting MS-13 cases, neither the U.S. Attorney's Office or the FBI. There's no interaction between those, no efforts made to find out, hey, does anybody else have a case? None. The question is, you know, what else do they lie about? What else do they get to just cover with impunity? I know these people. I'm not saying that they're liars, that they, these U.S. attorneys who I've known for many, many years, are without integrity. I'm saying that they've acted without responsibility. And we have a standard that says 11 times in this case, expressly from the trial court judge, turn this stuff over. Do it. Get it done. And if you don't, there's going to be consequences. And there are zero consequences here. Your Honor, Justice Marshall, he said it. We're a government of laws and not men. And if we have legal rights that have been violated without a legal process to help, we can't call ourselves that. Mr. Hunter, you seem to be advocating for a strict liability standard when it comes to Brady and Giglio violations, and that's not the test. I think it's some liability, Judge. But not strict liability, right? Not strict. You kind of show that whatever happened here, whether intentional or otherwise, undermined confidence in the outcome of the trial, that it made a difference in some way. And to get back to Judge Niemeyer's question about other than how would you have used this evidence in a way that would have made a difference? Your Honor, I would have cross-examined, Claudio saw about every contact that he had with every single member of the prosecution team, with the agents, everything about that, and all of the trials that they'd chosen to put him on. With the expressed knowledge, the ability to show that his superiors didn't just think that he violated the Foreign Agents Registry Act, but that he was actively cooperating with someone who was corrupt, that he gave $29,000 worth of U.S. government property that he claimed. We only have him as the source here. What does that lead to the relevance to what he was testifying? In other words, if he was linked, your suggestion of possible link to MS-13, then he would mitigate his testimony and testify more favorably in favor of your clients. But he was basically talking about a structure, and I don't understand where you think he went wrong in his testimony. His testimony was background, which was repeated and restated by numerous witnesses. But it was background from a single person who could comprehensively put together the MS-13 structure. Now, my question is, you can make him into a bad man, but what do you gain? Your Honor, what we gain from that, incredibly important to trial, you were a trial court judge, is showing that these other four witnesses who come in and testify to the same things, who have significant problems with their credibility because they're violent felons, because they're asking for something in exchange for their testimony. That's why they're there. That this man who says the same thing, who was chosen by the government as their witness to put up, is a liar. That's what we wanted to have had at trial. But there's no specific liar you're pointing to. You're just saying you want to call his credibility into question generally and have that question as to credibility also be cast against the other cooperating witnesses. I think it makes the credibility of everything the government says quite suspect when this man, the very first words out of his mouth as he's testifying are about his experience and the literally dozens of trials in literally dozens of court districts that he's testified in. As an expert on MS-13, that this is the guy the government chooses to tell you these things. So it's their choice of witness, not anything that he said. Choice of witness is an enormous thing here, Judge. But another witness could have come in and said the exact same thing in terms of framing. We wouldn't be here if they'd had another witness. This is the witness they chose. All right. Thank you, Mr. Palmer.
judges: Albert Diaz, Paul V. Niemeyer, Matthew James Maddox